**FRATERNAL ORDER OF POLICE, COLORADO LODGE # 27, a Colorado Non-profit Corporation; Fraternal Order of Police, Colorado State Lodge, a Colorado Non-profit Corporation; and Larry Nead, Petitioners,**

v.

**CITY AND COUNTY OF DENVER, a Municipal Corporation; and Elizabeth H. McCANN, in Her Official Capacity as Manager of Safety for the City & County of Denver, Respondents.**

No. 95SC698.

Supreme Court of Colorado,
En Banc.

Nov. 12, 1996.

---

Wood, Ris & Hames, P.C., Donald B. Gentry, Denver, Hamilton & Faatz, Michael E. Gurley, Denver, for Petitioners.

Daniel E. Muse, City Attorney, Alice J. Fischer, Assistant City Attorney, Geoffrey S. Wasson, Assistant City Attorney, Denver, for Respondents.

David W. Broadwell, Denver, for Amicus Curiae Colorado Municipal League.

Justice SCOTT delivered the Opinion of the Court.

Today, we must decide whether a statutory enactment mandating statewide training and certification of peace officers can impose its requirements upon deputy sheriffs employed by the City and County of Denver, a home rule city, when, under our constitution, Denver is granted the authority to control the qualifications, powers, and duties of its deputy sheriffs.[1] Because we conclude (1) that

---

1. Our order granting certiorari in *Fraternal Order of Police v. City & County of Denver*, 914 P.2d 483 (Colo.App.1995), set forth the following issues for briefing and oral argument:

 I. Where the district court found on undisputed facts that "there is a substantial state concern to protect the public from inadequately trained peace officers," do the statutory provisions of §§ 24–31–301 to –307, 10A C.R.S. (1994 Supp.), requiring uniform training and Peace Officers Standards and Training (POST) certification of peace officers supersede a City regulation which does not have POST certification as a requirement for its deputy sheriffs?

 II. Are the criteria for resolving the question of supremacy of state law versus home rule

the Colorado Constitution grants Denver, as a home rule city, authority over the qualifications of its deputy sheriffs and (2) that the state's interest in public safety does not, in light of the limited duties and responsibilities of Denver deputy sheriffs, outweigh the exercise of Denver's authority created by our constitution, we hold that the legislative enactment cannot impose its requirements upon Denver's deputy sheriffs. However, while we affirm the judgment of the court of appeals, we do so on a rationale different from that court and in accordance with the views expressed here.

## I.

In 1992, the Colorado General Assembly enacted the Peace Officers Standards and Training Act (POST Act) to provide uniform training and certification for peace officers entrusted with protecting the safety of the citizens of this state. Colo. Sess. Laws 1992, ch. 167, §§ 24–31–301 to –306, at 1091–96 (amended without relevant substantive changes and codified at sections 24–31–301 to –307, 10A C.R.S. (1996 Supp.)). The POST Act also created the Peace Officers Standards and Training Board (POST Board) to establish certification standards and to certify qualified peace officers. Colo. Sess. Laws 1992, ch. 167, §§ 24–31–302, 303, at 1093 (codified at sections 24–31–302, 303).

At all times relevant here, the POST Act required certification for peace officers throughout the state. Colo. Sess. Laws 1992, ch. 167, § 24–31–306, at 1095 (repealed by section 24–31–306(1)(b)).[2] Under the POST Act, a "peace officer" includes any "deputy sheriff other than one appointed with authority only to receive and serve summons and civil process ... [who] is employed by the state or a city, city and county, town, judicial district, or county within this state." Colo. Sess. Laws 1992, ch. 167, § 24–31–301(5), at 1092.[3] Despite these statutory provisions, Respondent, the City and County of Denver (Denver), did not require POST certification for its deputy sheriffs.

In June 1992, the POST Board wrote a letter to Denver expressing its concern that Denver deputy sheriffs were not being certified as peace officers. Denver responded that the issue had been previously litigated,[4] and that its deputy sheriffs were not required to be certified under the POST Act because they do not engage in routine law enforcement duties. As a result, the petitioners, Fraternal Order of Police of Colorado Lodge # 27, Fraternal Order of Police of Colorado State Lodge, and Larry Nead (collectively F.O.P.), filed this civil action seeking a declaratory judgment that, under the 1992 version of the POST Act, Denver deputy sheriffs are entitled to the minimum training prescribed by the POST Board and must receive state certification in accordance with POST Board standards.

law in matters of mixed state and local concern established by *City & County of Denver v. State*, 788 P.2d 764 (Colo.1990), or does *Passarelli v. Schoettler*, 742 P.2d 867 (Colo.1987), establish a different rule where the constitutional enabling provision for home rule cities grants broad authority to cities to establish qualifications for its officers, i.e., deputy sheriffs?

2. Section 24–31–305, 10A C.R.S. (1996 Supp.), currently sets forth the basic peace officer certification requirements which are approved and administered by the POST Board.

3. In 1992, subsequent to the trial court's entry of summary judgment, the POST Act was amended. Under the amended act, a peace officer is defined as "any person described in § 18–1–901(3)(l)(I), C.R.S." Section 18–1–901(3)(l)(I), in turn, defines level I peace officers to include deputy sheriffs: " 'Peace officer, level I,' means a

police officer, undersheriff, deputy sheriff ... who is employed by the state or any city, city and county, town, or county within this state and who is certified pursuant to section 24–31–305, C.R.S." § 18–1–901(3)(l)(I), 8B C.R.S. (1996 Supp.).

The court of appeals addressed and rejected Denver's contention that the amended version of the POST Act excludes Denver deputy sheriffs and therefore the issue is moot. However, that issue is not before us on appeal.

4. Denver cited *International Brotherhood of Police Officers, Local No. 127 v. City & County of Denver*, 185 Colo. 50, 54, 521 P.2d 916, 918 (1974), which held that Denver deputy sheriffs have no powers or duties other than those prescribed by rules and directives of Denver's Manager of Safety, and do not have the general police power that is provided by statute for deputy sheriffs in other counties.

The parties filed cross-motions for summary judgment. F.O.P. argued that the POST Act was applicable to the City and County of Denver because the training and certification of Denver deputy sheriffs is a matter of statewide concern. Denver asserted that, as a home rule municipality defined by Article XX, Section 6, of the Colorado Constitution, its authority arises from its city charter and does not derive from state statutes and, therefore, it had the authority to establish standards and training for its deputy sheriffs. Indeed, the record reveals that the training division of the Denver Sheriff Department conducts an extensive, full-time training program for its deputy sheriffs, which lasts for 10–16 weeks depending on the particular assignment of each deputy.[5] The trial court, however, relying on *City & County of Denver v. State*, 788 P.2d 764 (Colo. 1990) [hereinafter *Denver v. State* ], determined that a substantial state interest exists in protecting the public from inadequately trained peace officers and, therefore, granted F.O.P.'s motion for summary judgment and denied Denver's motion.

On appeal, the court of appeals concluded that the POST Act was not applicable to Denver, a home rule city, because Article XX, Section 2, of the Colorado Constitution specifically grants to Denver the authority to control the qualifications, as well as the powers, duties, and terms or tenure, of its deputy sheriffs. *Fraternal Order of Police*, 914 P.2d at 487–88. Although it agreed with the trial court that the statute and the constitution were in direct conflict, the court of appeals nevertheless reasoned that when such a conflict arises, the constitution is the paramount law. *Id.* at 487 (citing *Passarelli v. Schoett-ler*, 742 P.2d 867 (Colo.1987)). Thus, the court of appeals reversed the trial court and concluded that Denver's authority under the Colorado Constitution to control the qualifications of its officers, including deputy sheriffs, is absolute and cannot be infringed by state statute. *Id.* at 488. We do not adopt the rationale of the court of appeals; however, we affirm its judgment on different grounds set forth below.

## II.

F.O.P. argues that the principles of *Denver v. State* are controlling in a case such as this, where a state statute and a home rule provision seek to govern the same conduct and, therefore, the court of appeals' reliance on *Passarelli v. Schoettler* was misplaced. We agree. Nonetheless, applying the principles announced in *Denver v. State*, we do not reach the result sought by F.O.P. and, thus, affirm.

### A.

Denver is a home rule city existing pursuant to Article XX of the Colorado Constitution. *Robertson v. City & County of Denver*, 874 P.2d 325, 350 (Colo.1994) (Erickson, J., dissenting). Article XX, Section 6, adopted by the voters in 1912, granted "home rule" powers to municipalities choosing to operate under its provisions and, in doing so, altered the basic relationship of such municipalities to the state. *See Denver v. State*, 788 P.2d at 766.[6] That provision provides in pertinent part:

**Home rule for cities and towns.** The people of each city or town of this state

5. The training division of the Denver Sheriff Department provides training for all recruits. In addition to the minimum qualifications that any person selected for appointment as a Denver deputy sheriff must meet, including psychological testing, background investigations, medical exams, drug tests and interviews, each recruit is given 10–16 weeks of training. Trainees receive eight weeks of classroom instruction, occurring Monday through Friday from 7:00 a.m. until 3:00 p.m., and trainees are given written examinations following each week of classroom instruction. Thereafter, recruits receive an additional two weeks of on-the-job training at the Denver County Jail or eight weeks at Denver's Pre–Ar-raignment Detention Facility, depending upon their assignment.

6. Article XX, Section 6, altered the relationship created by "Dillon's Rule" in Colorado, which stated:

Municipal corporations owe their origin to, and derive their powers and rights wholly from, the legislature. It breathes into them the breath of life, without which they cannot exist. As it creates, so may it destroy. If it may destroy, it may abridge and control.

*Denver v. State*, 788 P.2d at 767 (citing *City of Clinton v. Cedar Rapids & Mo. River R.R.*, 24 Iowa 455, 475 (1868)).

... are hereby vested with, and they shall always have, power to make, amend, add to or replace the charter of said city or town, which shall be its organic law and extend to all its local and municipal matters.

Such charter and the ordinances made pursuant thereto in such matters shall supersede within the territorial limits and other jurisdiction of said city or town any law of the state in conflict therewith.

. . . .

... [S]uch city or town, and the citizens thereof, shall have the powers set out in sections 1, 4 and 5 of this article, and all other powers necessary, requisite or proper for the government and administration of its local and municipal matters, including power to legislate upon, provide, regulate, conduct and control:

a. The creation and terms of municipal officers, agencies and employments; *the definition, regulation and alteration of the powers, duties, qualifications and terms or tenure of all municipal officers, agents and employees.*

Colo. Const. art. XX, § 6 (emphasis added).

 Article XX was adopted by a favorable vote of the Colorado electorate. By adopting that amendment to our constitution, the people of Colorado specifically granted citizens of home rule municipalities the right to name their own officers and determine how those officers should be selected, their qualifications, and their tenure. *City & County of Denver v. Rinker*, 148 Colo. 441, 447, 366 P.2d 548, 551 (1961). Thus, the overall effect of the amendment was to grant to home rule municipalities the power the legislature previously had and to limit the authority of the legislature with respect to local and municipal affairs in home rule cities. *Denver v. State*, 788 P.2d at 767. Although the legislature continues to exercise authority over matters of statewide concern,

a home rule city pursuant to Article XX is not necessarily inferior to the General Assembly with respect to local and municipal matters. *Board of County Comm'rs v. City of Thornton*, 629 P.2d 605, 609 (Colo.1981).

## B.

 Under this constitutional transfer of authority, circumstances may arise, as here, where a home rule provision of the constitution conflicts with a statutory enactment of the General Assembly, and the respective authorities of the state legislature and the home rule municipality must therefore be reconciled. In determining which provision should prevail, we have previously recognized three broad categories of regulatory matters: (1) matters of local concern; (2) matters of statewide concern; and (3) matters of mixed state and local concern. *See Denver v. State*, 788 P.2d at 767; *City & County of Denver v. Board of County Comm'rs*, 782 P.2d 753, 762 (Colo.1989); *National Advertising Co. v. Department of Highways*, 751 P.2d 632, 635 (Colo.1988); *City & County of Denver v. Colorado River Water Conservation Dist.*, 696 P.2d 730, 740–41 (Colo.1985). Thus, the determination that a matter is of local concern, statewide concern, or of mixed state and local concern controls the ultimate resolution of such a conflict.[7]

 However, we have recognized that no specific legal standard or litmus test exists which can resolve in every case the issue of whether a particular matter is of local, state, or mixed concern. *Colorado River Water Conservation Dist.*, 696 P.2d at 741. Instead, the determination must be made on an ad hoc basis, taking into consideration the facts of each case. *Id.* (citing *Denver & R.G.W. R.R. v. City & County of Denver*, 673 P.2d 354, 358 (Colo.1983)). A critical factor in that consideration is the interest of the

7. Generally, it follows that when a home rule provision and a state statute conflict with respect to a local matter, the home rule provision supersedes the conflicting state provision. *Colorado River Water Conservation Dist.*, 696 P.2d at 740; Colo. Const. art. XX, § 6. In matters of statewide concern, however, the General Assembly may adopt legislation and home rule municipalities are without power to act unless authorized by state statute or the constitution. *Colorado River Water Conservation Dist.*, 696 P.2d at 740. And, in matters of mixed local and state concern where there is a conflict, the state statute will prevail. *National Advertising Co.*, 751 P.2d at 635.

state in regulating the matter. For example, a minor interest by the state usually will not be sufficient to overcome the local regulation. *See Denver v. State,* 788 P.2d at 770 (in contrast to the asserted state interest in forbidding municipal residency rules, the asserted local interests are substantial); *City of Thornton,* 629 P.2d at 610 (while county planning and zoning regulations are of statewide concern, the preservation of the value of city property is a local and municipal matter). Indeed, "even though the state may be able to suggest a plausible interest in regulating a matter to the exclusion of a home rule municipality, such an interest may be insufficient to characterize the matter as being even of 'mixed' state and local concern." *Denver v. State,* 788 P.2d at 767.

In *Denver v. State,* we considered, under Article XX, Section 6, whether home rule cities were entitled to implement employee residency requirements despite a state statute forbidding such requirements. After reviewing prior case law dealing with conflicting state and home rule provisions, and in attempting to assess the state's interest in residency requirements, we concluded:

> [I]n determining whether the state interest is sufficient to justify preemption of inconsistent home rule provisions, there are several general factors which are useful to consider. These include the need for statewide uniformity of regulation ... and the impact of the municipal regulation on the persons living outside the municipal limits.
>
> . . . .
>
> Also relevant to this determination are historical considerations, i.e., whether a particular matter is one traditionally governed by state or by local government. Further, where not only uniformity is necessary but cooperation among governmental units, as well, and where action of state and county officials within the limits of the city is imperative to effectuate adequate protection outside the city, the matter will in all likelihood be considered a

state concern.... Finally, we have considered relevant the fact that the Colorado Constitution specifically commits a particular matter to state or local regulation.

*Denver v. State,* 788 P.2d at 768 (internal citations and quotations omitted). However, in setting out the various factors to be considered, we necessarily rejected a bright line rule for such cases. As pertinent here, we noted that it was "significant" that the text of the Colorado Constitution commits a particular matter to state or local regulation, but that such a provision alone was not dispositive. *Id.* at 771.

Nevertheless, the court of appeals below summarily concluded that Denver's authority over the qualification of municipal officers pursuant to Article XX, Section 2, of the constitution trumped the state statute requiring POST Board certification of peace officers and therefore reversed the trial court's summary judgment. The court relied in large part on our decision in *Passarelli v. Schoettler,* 742 P.2d 867 (Colo.1987), which held that a particular statute passed by the General Assembly violated Article XXI, Section 4, of the Colorado Constitution. The court of appeals' reasoning and reliance on that case, however, is erroneous for two reasons. First, *Passarelli* is not applicable to the instant case because it does not deal with conflicting state and municipal provisions.[8] Second, the court of appeals' conclusion, based on our analysis in *Passarelli,* improperly fashions an absolute rule that when a state statute and home rule provision of the constitution are in conflict, the constitution always controls. We rejected that reasoning in *Denver v. State,* 788 P.2d at 770, 771 (constitutional authority granted to home rule municipalities is not unlimited and even specific enumeration in the constitution is not dispositive), and reject it again here.

Thus, we agree with Denver's contention that this case is governed by *Denver v. State,* rather than by certain unrelated principles noted in *Passarelli v. Schoettler.* Indeed, we have consistently relied on *Denver v. State* to

---

**8.** In *Passarelli,* we held that a statute limiting reimbursement of expenses incurred by incumbent public officers who prevail in recall elections to ten cents per voter violated Article XXI,

Section 4, of the Colorado Constitution, which expressly requires reimbursement from the state treasury of such expenses. *Passarelli,* 742 P.2d at 871–72.

review the spheres of regulatory authority that belong to the state and its political subdivisions by distinguishing local matters from matters of statewide concern. *See, e.g., Robertson v. City & County of Denver,* 874 P.2d 325, 350–51 (Colo.1994) (Erickson, J., dissenting); *Voss v. Lundvall Bros., Inc.,* 830 P.2d 1061, 1066 (Colo.1992); *Walgreen v. Charnes,* 819 P.2d 1039, 1045 (Colo.1991). We therefore will apply the framework of *Denver v. State* to the present case.

## III.

F.O.P. asserts that, consistent with the standard applied in *Denver v. State,* the state's interest here in the training and certification of peace officers under the POST Act supersedes Denver's grant of authority pursuant to Article XX, Section 2, of the Colorado Constitution to determine the "jurisdiction, term of office, duties and qualifications" of its officers. We disagree.

■ As noted above, there are several general factors to consider in determining whether the state's interest in the matter at hand is sufficient to justify preemption of the inconsistent home rule provisions.[9] These factors include: (1) the need for statewide uniformity of regulation; (2) the extraterritorial impact—i.e., the impact of the municipal regulation or home rule provision on persons living outside the municipal limits; (3) any other state interests; and (4) the asserted local interests in the municipal regulation contemplated by the home rule provision— e.g., does the Colorado Constitution specifically commit a particular matter to state or local regulation. *Denver v. State,* 788 P.2d at 768.

### A. Uniformity

We first consider whether there exists a need for statewide uniformity of training for all peace officers, and in particular, whether Denver deputy sheriffs must conform to that uniform procedure. F.O.P. assumes that because the state has admitted an interest in statewide uniformity for the training of its

peace officers, such an interest necessarily extends to the training of Denver deputy sheriffs. However, F.O.P. has failed to assert any specific state interest in the uniformity of training for Denver deputy sheriffs and, based on the record before us, we do not perceive one.

Previously, we have recognized an interest in uniform statewide appeals for contested sales or use tax based on the Colorado constitutional regulation that all laws relating to state courts shall be uniform in their application. *Walgreen v. Charnes,* 819 P.2d 1039, 1046 (Colo.1991) (citing Colo. Const. art. VI, § 19). In that context, we stated that to allow each local statutory or home rule government to specify its own appeal procedures for locally imposed sales and use taxes would result in multiple appellate proceedings from which district courts would be forced to choose. *Walgreen,* 819 P.2d at 1047 (such a result directly contravenes the requirements of Article VI, Section 19, of the Colorado Constitution); *see also Gold Star Sausage Co. v. Kempf,* 653 P.2d 397 (Colo.1982).

Similarly, in *National Advertising Co. v. Department of Highways,* 751 P.2d 632, 635–36 (Colo.1988), the state was able to demonstrate that uniform regulation of highway advertising signs was necessary to prevent potential loss of federal revenue, and to achieve and maintain specific statewide safety, recreational, aesthetic, and fiscal goals. We concluded that "[v]esting a home rule municipality with exclusive control over outdoor advertising devices located within the municipality along roads of the state highway system would materially impede, if not destroy, any prospect of achieving those goals." *Id.* at 636.

In *Denver v. State,* however, we rejected the need for uniformity and held that municipal residency requirements were not a state concern. We noted that "uniformity in itself is no virtue, and a municipality is entitled to shape its local law as it sees fit if there is no *discernible pervading state interest* involved." *Denver v. State,* 788 P.2d at 769 (quoting *State ex rel. Heinig v. City of Mil-*

---

9. While we recognize that the list of factors in *Denver v. State* is not exhaustive, we nevertheless find them sufficient for our purposes here.

*waukie,* 231 Or. 473, 373 P.2d 680, 684 (1962) (emphasis added)); *see also* Daniel R. Mandelker & Dawn C. Netsch, *State and Local Government in a Federal System* 237 (1977) ("If there is no need for statewide uniformity, there is no need for state law to preempt local power to regulate. . . .").

Here, F.O.P. has failed to demonstrate any pervading state interest, based on the principles of uniformity, for POST Act training and certification of Denver deputy sheriffs. Although statewide uniformity of training for *police* officers is a legitimate state interest, that interest becomes substantial due to (1) the responsibilities and duties of such officers, which require continuous interaction with citizens on public and private property in the normal course of their daily activities, and (2) the impact of such pervasive encounters upon public safety. Generally, police officers exercise arrest authority and deal with the general public in all matters related to law enforcement. To the contrary, it is undisputed that Denver deputy sheriffs do not have the authority to effect warrantless arrests or to engage in the general patrol and investigative law enforcement duties which are delegated by city charter to the Denver Police Department.[10] Instead, their responsibilities are limited to court related activities, i.e., service of process and duty as bailiffs, or activities related to the Denver detention facilities. In fact, Denver deputy sheriffs do not have the same statewide responsibilities or duties and, hence, impact upon public safety as do police officers. *See Local No. 127,* 185 Colo. at 54, 521 P.2d at 918 (Denver deputy sheriffs not given general police power).

The general duties and responsibilities of Denver deputy sheriffs were outlined in *Local No. 127.* There, we stated:

**10.** That is not to say, however, that deputy sheriffs in other counties do not have such power. *See International Bhd. of Police Officers, Local No. 127 v. City & County of Denver,* 185 Colo. 50, 54, 521 P.2d 916, 918 (1974) [hereinafter *Local No. 127*] ("[T]here is no authority, constitutional or statutory, granting deputy sheriffs of the City and County of Denver the same general police powers given sheriffs and their deputies in other counties.")

**11.** We note, however, that our holding today is limited to the facts before us. Thus, if Denver

[Denver deputy sheriffs'] duties . . . are limited to service of process, acting as bailiffs and limited police custodial duties within the confines of Denver's courts and detention facilities at the county jail and the Denver General Hospital. Nowhere are they granted the general police powers by charter or ordinance or by deputization from the Manager of Safety. We find no constitutional basis for the exercise of that power.

*Local No. 127,* 185 Colo. at 54, 521 P.2d at 918. That limited grant of power to Denver deputy sheriffs as described in *Local No. 127* is not disputed here by F.O.P. and is acknowledged by Denver. And, although the summary of duties in *Local No. 127* was based on 1974 regulations, the current duties and responsibilities of Denver deputy sheriffs, which are described in great detail in the record before us, do not establish any different or additional responsibilities that are intended to or would create a significant impact beyond Denver's boundaries.[11] Thus, we do not perceive a need for statewide uniformity of training that would include Denver deputy sheriffs.[12]

### B. Extraterritorial Impact

Extraterritorial considerations have been defined as those involving the expectations of state as opposed to local residents. *Denver v. State,* 788 P.2d at 768 (citing *Bennion v. City & County of Denver,* 180 Colo. 213, 504 P.2d 350 (1972)). F.O.P. asserts that safety concerns regarding the transportation and incarceration of persons in Denver's detention facilities have an impact beyond Denver's borders so as to create a pervading state interest. We disagree.

changes, in any significant way, the duties and responsibilities of its deputy sheriffs, our result here might not apply.

**12.** As noted by Denver, the POST Act does not mandate uniform training for all peace officers. Only certain peace officers designated as "Level I" are required to be trained under the Act. Thus, the argument that uniformity of training is required for all peace officers is belied by the very terms of the POST Act.

Article XX, Section 2, of the constitution provides in part that "the jurisdiction, term of office, duties and qualifications of Denver's officers shall be such as in the charter may be provided." In *Local No. 127*, we stated that "[i]f there be legal authority for deputy sheriffs to make arrests, it must originate in the charter." 185 Colo. at 53, 521 P.2d at 917. It is undisputed here that Denver deputy sheriffs are not authorized under the Denver charter to make warrantless arrests. We stated specifically in *Local No. 127*, and the record before us confirms again here, that Denver deputy sheriffs' duties generally "are limited to service of process, acting as bailiffs and limited police custodial duties *within the confines of Denver's courts and detention facilities at the county jail and the Denver General Hospital.*" *Local No. 127*, 185 Colo. at 54, 521 P.2d at 918 (emphasis added). Moreover, the authority of Denver deputy sheriffs to carry firearms does not create any additional or substantial impact beyond the city's boundaries.

Thus, contrary to the argument of F.O.P., Denver's deputy sheriffs are not authorized to make warrantless arrests under the Denver charter, and any contact they have with people outside of the City and County of Denver in the performance of their duties is not pursuant to any prescribed power under the charter and therefore is merely incidental. Thus, we conclude that the extraterritorial impact of Denver deputy sheriffs is, at best, *de minimis*.

## C. Other State Interests

F.O.P. asserts that the state has a substantial interest in protecting· the public from inadequately trained peace officers, i.e., an interest in "the general public's safety." However, contrary to the conclusion of F.O.P. and the trial court, the limited authority of Denver deputy sheriffs does not place them on "the front line of law enforcement" either within the City and County of Denver or elsewhere in this state. We have previously determined that, unlike police officers who exercise far greater and more pervasive authority, Denver deputy sheriffs are not engaged in the exercise of general police power and, therefore, do not have any signifi-

cant impact on the general public. *Local No. 127*, 185 Colo. at 54, 521 P.2d at 918; *see also City & County of Denver v. Rinker*, 148 Colo. 441, 447, 366 P.2d 548, 551 (1961) (the office of sheriff is a county office and not a state office).

It is undisputed that the duties of these deputy sheriffs are governed by the Denver charter, that under that charter they do not have the power to make arrests (other than by warrant), and their primary duties involve service within the various Denver courts, as process servers and bailiffs, and as security personnel within Denver's two detention centers. Also, although not determinative under the standard we apply here, Denver has implemented a 10–16 week training program, which includes training in the use of firearms.

In sum, because Denver deputy sheriffs do not have the authority to impact significantly any circumstances outside of the Denver courts or jails, and, as a consequence, will not substantially impact public safety beyond the boundaries of Denver, and because Denver's deputy sheriffs receive extensive training prior to their assignments, we conclude that the state does not have a sufficient interest in their qualifications.

## D. Local Interests

In contrast, Denver's interest in the training and certification of its deputy sheriffs is substantial and has direct textual support in the Colorado Constitution and in case law precedent. First, Article XX, Section 6, gives home rule cities and towns, generally, the power to "legislate upon, provide, regulate, conduct and control ... the definition, regulation and alteration of the powers, duties, qualifications and terms or tenure of all municipal officers, agents and employees." More specifically as to the City and County of Denver, Article XX, Section 2, provides in pertinent part:

The officers of the city and county of Denver shall be such as by appointment or election may be provided for by the charter; and the jurisdiction, term of office, duties and *qualifications* of all such officers shall be such as in the charter may be provided; but the charter shall designate

the officers who shall, respectively, perform the acts and duties required of county officers to be done by the constitution or by the general law, as far as applicable. Colo. Const. art. XX, § 2 (emphasis added).

■ Additionally, we rely upon our own precedent to indicate what constitutes a local concern, as opposed to a statewide concern. *Robertson v. City & County of Denver,* 874 P.2d 325, 350 (Colo.1994) (Erickson, J., dissenting). In this context, we have previously determined that the duties and responsibilities of Denver deputy sheriffs are limited in scope and that these deputies do not have general police power. *Local No. 127,* 185 Colo. at 54, 521 P.2d at 918. We have also stated that the office of sheriff is a county office and not a state office. *Rinker,* 148 Colo. at 447, 366 P.2d at 551.

Thus, Article XX, Sections 2 and 6, along with our case law precedent, provides evidence in text and by context that the qualification and certification of Denver deputy sheriffs is a local concern. Furthermore, Denver has a substantial interest in the qualifications of its own public officers and the recognition of that interest generally in home rule municipalities was affirmed by the voters of the state of Colorado.

■ Because F.O.P. has failed to demonstrate a state interest sufficient to outweigh Denver's home rule authority, we conclude the provisions of the constitution supersede the conflicting provisions of the POST Act. *See Denver v. State,* 788 P.2d at 767. However, in so holding, we recognize and again make clear that enumeration in the constitution of matters subject to regulation by home rule municipalities is not dispositive. *Id.* at 771. Nevertheless, because we can find no pervading state interest in regulating the training of Denver's deputy sheriffs, we find the matter to be one of local concern.

## IV.

■ Our holding today recognizes that the authority granted to home rule municipalities in either Section 2 or Section 6 of the Colorado Constitution is not unlimited. *See Denver v. State,* 788 P.2d at 770. We therefore construe the term "qualifications"

narrowly. Indeed, certain aspects of municipal employment exist which are of statewide concern and where state interests are pervading, state statutes would supersede inconsistent municipal provisions. *See, e.g., City of Colorado Springs v. Industrial Comm'n,* 749 P.2d 412 (Colo.1988) (unemployment benefits); *Huff v. Mayor of Colorado Springs,* 182 Colo. 108, 512 P.2d 632 (1973) (pension plans); *City & County of Denver v. Thomas,* 176 Colo. 483, 491 P.2d 573 (1971) (worker's compensation); *Denver v. Sweet,* 138 Colo. 41, 329 P.2d 441 (1958) (income tax).

■ However, we find today's case distinguishable from those cases. Here, we are dealing with the training and certification of municipal employees, which clearly contemplates the "qualification" aspect of the constitutional provisions, whereas the cases above address a corollary condition or benefit of employment. Thus, we conclude that the relevant provisions of the Colorado Constitution, which specifically grant Denver the authority over the qualifications of its municipal officers, supersede the provisions of the POST Act because F.O.P. has not shown a substantial or pervading state interest in the training and certification of Denver deputy sheriffs, peace officers of a home rule municipality with limited authority and duties.

Moreover, we note that this holding regarding the training and certification under the POST Act is limited to *Denver* deputy sheriffs. Article XX, Section 2, pertains only to the City and County of Denver. We therefore do not decide whether the training and certification of deputy sheriffs in other cities and towns, who may have different duties and responsibilities, would implicate other, more substantial state interests.

## V.

We hold that, under the principles of *Denver v. State,* the state of Colorado's interest in the training and certification of Denver deputy sheriffs under the POST Act is insufficient to supersede the authority given to Denver to determine the qualifications of persons serving as its deputy sheriffs in accordance with Article XX, Sections 2 and 6. We therefore affirm the result reached by

the court of appeals but, in doing so, reject the analysis on which that result was based and support our judgment based upon the principles set forth herein. The case is returned to the court of appeals with directions for that court to remand it to the trial court for further proceedings consistent with this opinion.

LOHR, J., concurs in part and dissents in part.

Justice LOHR concurring in part and dissenting in part:

The majority holds that under the principles of *City & County of Denver v. State,* 788 P.2d 764 (Colo.1990), the interest of the State of Colorado (State) in the training and certification of Denver deputy sheriffs is insufficient to permit the State to prescribe such training and certification. Accordingly, the majority holds that the Peace Officers Standards and Training Act, §§ 24–31–301 to –307, 10A C.R.S. (1996 Supp.) (POST Act), which purports to apply to all peace officers, does not govern the training and certification of Denver deputy sheriffs. I would hold, as the trial court determined, that the State has a substantial interest in protecting the public from inadequately trained peace officers, including Denver deputy sheriffs, and that the POST Act is applicable to such officers under the principles of *Denver v. State.* Therefore, although I concur with the analytical framework employed by the majority, I dissent to the result.

## I.

The Colorado General Assembly adopted the POST Act in 1992, after determining and declaring that the Act was "necessary for the immediate preservation of the public peace, health, and safety." Ch. 167, sec. 14, §§ 24–31–301 to –307, 1992 Colo. Sess. Laws 1091, 1102. The POST Act requires that any

"peace officer" in the State of Colorado receive certification from the POST Board that he or she complies with the training and qualification standards adopted by that Board. Maj. op. at 585 & nn. 2, 3 (citing various POST Act provisions). Denver deputy sheriffs are "peace officers" for POST Act purposes. *See id.* at 585 & n. 3.

On two occasions in June of 1992, the POST Board wrote the Director of Corrections and Undersheriff for the Denver County Jail and expressed concern that Denver deputy sheriffs were not POST-certified. Denver maintained in response that its deputy sheriffs were not subject to POST Act training and certification requirements. This action was then brought by Fraternal Order of Police, Colorado Lodge # 27; Fraternal Order of Police, Colorado State Lodge; and Larry Nead, a Denver deputy sheriff (collectively F.O.P.), seeking a declaratory judgment that Denver deputy sheriffs are subject to the POST Act certification requirements. The parties filed cross-motions for summary judgment, and the district court entered a declaratory judgment in favor of F.O.P. after holding that "there is a substantial state concern to protect the public from inadequately trained peace officers." The district court noted that Denver deputy sheriffs "have limited powers to make arrests," the deputy sheriffs "do come in contact with the citizens of this state and others in the course of performing their duties," and the deputy sheriffs "are armed and authorized to use weapons" in performing their duties.

On appeal, the Colorado Court of Appeals reversed. *Fraternal Order of Police v. City & County of Denver,* 914 P.2d 483, 484, 488 (Colo.App.1995). The court of appeals relied on the analytical framework outlined in *Passarelli v. Schoettler,* 742 P.2d 867, 872 (Colo.1987), and determined that Denver's constitutional home rule authority[1] takes

---

1. Article XX, section 6, of the Colorado Constitution grants home rule authority to "[t]he people of each city or town of this state, having a population of two thousand inhabitants as determined by the last preceding census taken under the authority of the United States, the state of Colorado or said city or town," including cities

such as Denver. Colo. Const. art. XX, § 6; *accord* maj. op. at 586–587 (citing *Robertson v. City & County of Denver,* 874 P.2d 325, 350 (Colo. 1994) (Erickson, J., dissenting)). Article XX, section 2, of the Colorado Constitution confers on Denver the specific authority to provide by its charter for "the jurisdiction, term of office,

precedence over any statewide statutory requirement relating to the qualifications of Denver's peace officers. *Fraternal Order,* 914 P.2d at 487. We then granted certiorari review. *See* maj. op. at 584 n. 1 (setting forth the issues on which we granted certiorari).

## II.

In Part II of its opinion, the majority outlines the relevant analytical framework that applies "where a state statute and a home rule provision seek to govern the same conduct." Maj. op. at 586. The majority determines that the court of appeals "improperly fashion[ed] an absolute rule that when a state statute and home rule provision of the constitution are in conflict, the constitution always controls." Maj. op. at 588. I agree, and therefore concur in part II of the majority opinion. *See* maj. op. at 586–589.

"[W]here a home rule provision of the constitution conflicts with a statutory enactment of the General Assembly," I agree with the majority that "the determination that a matter is of local concern, statewide concern, or of mixed state and local concern controls the ultimate resolution of such a conflict." Maj. op. at 587 (footnote omitted). We outlined the applicable standard of review in *Denver v. State:*

> In matters of local concern, both home rule cities and the state may legislate. However, when a home rule ordinance or charter provision and a state statute conflict with respect to a local matter, the home rule provision supersedes the conflicting state provision. In matters of statewide concern, the General Assembly may adopt legislation and home rule municipalities are without power to act unless authorized by the constitution or by state statute. Finally, we have held that in matters of mixed local and state concern, a charter or ordinance provision of a home rule municipality may coexist with a state statute as long as there is no conflict, but in the event of conflict the state statute supersedes the conflicting provision of the charter or ordinance.

duties and qualifications" of its officers. Colo.

*Denver v. State,* 788 P.2d at 767 (citations omitted). As the majority observes, a critical factor in determining the correct classification is the interest of the state in regulating the matter. Maj. op. at 588. Furthermore, I agree with the majority that several general factors apply to our consideration of the sufficiency of the state's interest in regulating a matter that otherwise falls within the scope of constitutional home rule authority:

> These factors include: (1) the need for statewide uniformity of regulation; (2) the extraterritorial impact—i.e., the impact of the municipal regulation or home rule provision on persons living outside the municipal limits; (3) any other state interests; and (4) the asserted local interests in the municipal regulation contemplated by the home rule provision.

Maj. op. at 589 (citing *Denver v. State,* 788 P.2d at 768); *accord* maj. op. at 588 (quoting *Denver v. State,* 788 P.2d at 768). The majority correctly considers whether the State has a sufficient interest in the training and qualifications of Denver deputy sheriffs according to principles of "uniformity," maj. op. at 589–590, "extraterritorial impact," maj. op. at 590–591, the state concern for "public safety," maj. op. at 591, and "local interests," maj. op. at 591–592. Although the four "general factors" relied upon by the majority are relevant to any inquiry regarding the magnitude of the state's interest, maj. op. at 587–588, 589, these four factors are neither mutually exclusive nor comprehensive. *See Denver v. State,* 788 P.2d at 767–68; *accord* maj. op. at 588, 589 n. 9. There is significant overlap among the four factors in the present case, illustrating the need to consider those factors as part of a broader inquiry relating to the strength of the State's interest in imposing a POST certification requirement upon Denver deputy sheriffs.

Although I agree with the majority's mode of analysis, I disagree with its ultimate conclusion under that analytical framework. I therefore respectfully dissent from parts III, IV, and V of the majority opinion. *See* maj. op. at 589–593.

Const. art. XX, § 2; *accord* maj. op. at 591–592.

## III.

The State has a significant interest in setting minimum training and qualification standards applicable to peace officers who serve as Denver deputy sheriffs. Denver's work description for its deputy sheriffs clarifies that Denver deputy sheriffs are in constant contact with prisoners held pursuant to state criminal charges. The deputy sheriffs are responsible for preventing escapes, apprehending escaped prisoners, and other pressing matters of public safety, and the deputy sheriffs act as guardians of the general public in the course of transporting criminal defendants to and from court. In order to perform their other duties, deputy sheriffs must qualify in the use of weapons. Denver prescribes the official duties of its deputy sheriffs in a work description:

> *Primary Duties:* Maintains security of prisoners confined in detention, holding, court, and medical facilities by enforcing rules and regulations, inspecting prisoners and detention quarters for contraband and safety hazards, supervising and instructing prisoners assigned to work details, observing prisoner behavior and physical condition, and controlling movement of prisoners and the public within the facilities. Acts as agent of County or District Courts executing warrants and serving court processes and orders. Ensures process paper and supporting documents are accurate and complete, locates individual to be served, and serves the papers in the proper manner. Takes individuals into custody. Transports prisoners between detention facilities, district police stations and headquarters, to and from courts, medical facilities, and other jurisdictions. Verifies identity of each prisoner and authority to hold and transport. Secures prisoners with appropriate equipment, searches transport vehicle and holding cells for contraband, checks vehicle for safety, and verifies proposed route of travel.... Assigns prisoners housing and work details. Reviews inmate charges, court orders, and legal status to ensure proper custody and disposition. Computes good time and release dates for sentenced prisoners. Informs prisoners of possible means of release or detention policies. Verifies the satisfaction of all charges. Ensures security and return of appropriate inmate property. Secures, inventories, and controls disposition of all equipment, supplies, prisoner uniforms and personal clothing, keys and/or weapons.... Dispatches sheriff vehicles by radio and/or monitors movement and current locations. Dispatches sheriffs to courtrooms and various other assignments or patrols.... Testifies in court as required.

> *Other Duties Performed:* Conducts preliminary investigations of accidents, fights and other incidents and documents findings. Places telephone calls for prisoners.... Informs prisoners, prisoner family members, attorneys, and other agencies or jurisdictions of prisoner status, court schedules, and department polices [sic].... Prepares various legal documents and provides testimony in court proceedings.... Escorts juries, ensures inmates appear in court as ordered, and performs other duties as ordered by the court. Monitors closed circuit television and motion detectors and notifies supervisor of security violations and take immediate corrective action.... As required, meets certification standards and qualifies in the use of weapons, physically subdues violent prisoners, and chases inmates on foot to apprehend them.

> Performs related work as required.

I disagree with the majority's conclusion that "because we can find no pervading state interest in regulating the training of Denver's deputy sheriffs, we find the matter to be one of local concern." Maj. op. at 592. According to Denver's own work description for deputy sheriffs, Denver deputy sheriffs maintain security in Denver detention facilities, and inspect, supervise, observe, instruct, search, and control prisoners in such facilities. The deputy sheriffs "physically subdue[ ] violent prisoners," "chase[ ] inmates on foot to apprehend them," "control or apprehend violent or fleeing prisoners," lift "injured or ill prisoners," execute warrants, serve process, and take individuals into custody. Denver deputy sheriffs testify in court, advise prisoners of court proceedings,

and prepare legal documents. Furthermore, Denver deputy sheriffs are responsible for members of the general public during visits to detention facilities and may have to transport prisoners to public medical facilities or protect members of the general public who serve as jurors. Denver even specifically requires Denver deputy sheriffs to transport prisoners to and from "other jurisdictions" if need be. *Accord, e.g., Roll v. Davis*, 85 Colo. 594, 598–600, 277 P. 767, 769 (1929) (trial court has power to direct Denver deputy sheriffs to proceed to a county other than Denver, receive a defendant held in that county, and remove that defendant for placement in a Denver jail). In short, Denver deputy sheriffs are intimately associated with "public safety" and have substantial "extraterritorial impact" in performing their duties as peace officers in Denver, the State capital and center of commerce. I would affirm the trial court's determination that the State has a sufficient interest in creating minimum uniform standards for armed peace officers who interact with criminal defendants from throughout this state and other jurisdictions to require that Denver deputy sheriffs comply with POST Act certification provisions.[2]

In my opinion, the majority unduly minimizes the extraterritorial impact and public safety implications that stem from the work of Denver deputy sheriffs. The majority first determines that because Denver deputy sheriffs do not have the same responsibilities as police officers, there is no need in terms of "uniformity" for Denver's deputy sheriffs to be subject to the POST Act certification requirement. Maj. op. at 589–590; *accord* maj. op. at 591. The majority concludes by quoting our 1974 summary of the Denver deputy sheriffs' responsibilities, found in *International Brotherhood of Police Officers, Local No. 127 v. City & County of Denver*, 185 Colo. 50, 54, 521 P.2d 916, 918 (1974), determining that "the current duties and responsibilities of Denver deputy sheriffs ... do not establish any different or additional responsibilities that are intended to or would create a significant impact beyond Denver's boundaries," and holding that "we do not perceive a need for statewide uniformity of training that would include Denver deputy sheriffs." Maj. op. at 590 (footnotes omitted). Although Denver deputy sheriffs are not police officers and therefore do not perform the same law enforcement duties as police officers, it does not follow that there is no need for statewide uniformity relating to minimum training and qualification standards for both police officers and Denver deputy sheriffs. *See* maj. op. at 589–590, 591. In addition, I believe that the majority errs in relying on our 1974 summary of the responsibilities of Denver deputy sheriffs, *see Local No. 127*, 185 Colo. at 54, 521 P.2d at 918, as an undisputed and comprehensive description of the work activities of Denver deputy sheriffs. *See* maj. op. at 590 & n. 11.[3] As previously noted, *supra* pp. 595–596, Denver requires its deputy sher-

---

2. *See generally, e.g., Robertson v. City & County of Denver*, 874 P.2d 325, 350–51 (Colo.1994) (Erickson, J., dissenting) (regulation of assault weapons is a statewide concern); *Walgreen Co. v. Charnes*, 819 P.2d 1039, 1046–47 (Colo.1991) (appellate process governing locally imposed sales and use taxes is of statewide concern); *National Advertising Co. v. Department of Highways*, 751 P.2d 632, 636–38 (Colo.1988) (regulation of highway advertising signs is a mixed statewide and local concern, subject to state statutory enactments); *City of Colorado Springs v. Industrial Comm'n*, 749 P.2d 412, 416–17 (Colo.1988) (unemployment benefits are a statewide concern); *Century Elec. Serv. & Repair, Inc. v. Stone*, 193 Colo. 181, 183–84, 564 P.2d 953, 955 (1977) (licensure of electricians is a statewide concern); *Huff v. Mayor of Colorado Springs*, 182 Colo. 108, 112–13, 512 P.2d 632, 634 (1973) (pension plans for firemen are a statewide concern); *Kelly v. City of Fort Collins*, 163 Colo. 520, 523, 431 P.2d 785, 787 (1967) (regulation of liquor is a statewide concern); *Spears Free Clinic & Hospital v. State*

*Bd. of Health*, 122 Colo. 147, 149–50, 220 P.2d 872, 874 (1950) (licensing of hospitals a statewide concern); *see also, e.g., Gold Star Sausage Co. v. Kempf*, 653 P.2d 397, 401 (Colo.1982) (limitations period for tax appeals is a statewide concern); *City & County of Denver v. Thomas*, 176 Colo. 483, 486, 491 P.2d 573, 574 (1971) (worker's compensation is a statewide concern); *Denver v. Sweet*, 138 Colo. 41, 52, 329 P.2d 441, 447 (1958) (income tax is a statewide concern); *City of Canon City v. Merris*, 137 Colo. 169, 182, 323 P.2d 614, 621 (1958) (driving under the influence is a statewide concern); *Keefe v. People*, 37 Colo. 317, 325, 87 P. 791, 793 (1906) (maximum workday of employees engaged in construction of municipal public works a statewide concern).

3. To the contrary, the description of the Denver deputy sheriffs' responsibilities found in *International Brotherhood of Police Officers, Local No. 127 v. City & County of Denver*, 185 Colo. 50, 54, 521 P.2d 916, 918 (1974), is anything but an

iffs to act as agents of County or District Courts in executing arrest warrants, and the responsibilities of Denver deputy sheriffs necessarily require the deputy sheriffs to interact with the general public.

Second, the majority determines that any "extraterritorial impact of Denver deputy sheriffs is, at best, *de minimis*," because Denver deputy sheriffs "are not authorized to make warrantless arrests" and "any contact [the deputy sheriffs] have with people outside of the City and County of Denver in the performance of their duties ... is merely incidental." Maj. op. at 591. In my opinion, it is misleading to summarize that the deputy sheriffs' contact with "people outside of the City and County of Denver" is "merely incidental." Maj. op. at 591. Denver detention facilities are not limited to residents of Denver, and any supervising law enforcement officers in the detention facilities have daily interactions with individuals who are not residents of Denver but who have become subject to jurisdiction of the criminal courts in Denver. Furthermore, although in the great majority of their activities, Denver deputy sheriffs will not interact "with people outside of the City and County of Denver," maj. op. at 591, Denver deputy sheriffs are authorized to execute arrest warrants, a function that can bring them in contact with persons who are not Denver residents.

Third, the majority reasons that "Denver deputy sheriffs do not have the authority to impact significantly any circumstances out-side of the Denver courts or jails, and, as a consequence, will not substantially impact public safety beyond the boundaries of Denver." Maj. op. at 591. I cannot agree with the majority that Denver deputy sheriffs "will not substantially impact public safety beyond the boundaries of Denver" because those deputy sheriffs have few responsibilities "outside of the Denver courts or jails." Maj. op. at 591. As previously discussed, *supra* pp. 595–596, Denver deputy sheriffs must qualify in the use of weapons, and their prescribed duties involve interaction with both the general public and criminal defendants who face state charges. Additionally, the state has a substantial interest in the welfare and safety of all of its citizens, including residents of Denver.

Finally, the majority maintains that "Denver has a substantial interest in the qualifications of its own public officers." Maj. op. at 592. Since Denver does have a constitutional grant of authority over the qualifications of its officers, *see* Colo. Const. art. XX, § 2, and because the majority "can find no pervading state interest in regulating the training of Denver's deputy sheriffs," the majority concludes that the training and qualifications of Denver's deputy sheriffs are matters of "local concern." Maj. op. at 592. I disagree. I conclude that the State has a sufficient interest in outlining minimum training and qualification requirements for Denver deputy sheriffs to support the legislature's imposition of a uniform POST Act certification requirement applicable to Denver deputy sheriffs.[4]

undisputed summary of those responsibilities. *See* maj. op. at 590. First, in *Local No. 127*, we described the duties of Denver deputy sheriffs "as delineated under the existing regulations." 185 Colo. at 54, 521 P.2d at 918. We noted that the powers and responsibilities of the Denver deputy sheriffs could be expanded "by charter or ordinance or by deputization from the Manager of Safety." *Id.* Indeed, "[d]epartmental rules and directives of the Manager of Safety govern a deputy sheriff's duties in Denver." *Id.*

Second, in F.O.P.'s "Brief in Support of Motion for Summary Judgment," F.O.P. attached as an appendix the official work description for Denver deputy sheriffs, obtained from Denver during discovery. *See supra* pp. 595–596 (summarizing official work description). This attachment belies any claim that the description of the responsibilities of Denver deputy sheriffs found in *Local No. 127*, 185 Colo. at 54, 521 P.2d at 918, is an undisputed summary. *See* maj. op. at 590. The majority's reliance on a 1974 description of the Denver deputy sheriffs' responsibilities is misplaced. *See* maj. op. at 589–590.

4. Our inquiry is simply whether POST certification for Denver deputy sheriffs is a matter of local concern, statewide concern, or of mixed state and local concern. *City & County of Denver v. State*, 788 P.2d 764, 767 (Colo.1990); *accord* maj. op. at 587. The majority places great emphasis on the existence of a training program for Denver deputy sheriffs within the Denver Sheriff Department in concluding that the training of Denver deputy sheriffs is solely a matter of local concern. *See* maj. op. at 586 & n. 5, 591. The majority determines that in part "because Den-

## IV.

I would reverse the court of appeals and affirm the district court's holding that there is a sufficient state interest to support the General Assembly's requirement that Denver deputy sheriffs comply with POST Act certification provisions. For the aforementioned reasons, I respectfully concur in part II and ·

dissent from parts III, IV, and V of the majority opinion.

ver's deputy sheriffs receive extensive training prior to their assignments, we conclude that the state does not have a sufficient interest in their qualifications." Maj. op. at 591. In my opinion, the Denver Sheriff Department's existing training program for Denver deputy sheriffs does not eliminate the state's interest in setting minimum training standards for peace officers who interact with citizens who are not Denver residents, es-

cort prisoners from other jurisdictions to Denver, execute arrests pursuant to warrant, carry arms, and protect members of the general public in the course of those citizens' jury duty or visits to the Denver jails. The state's interest in these matters is not to be determined by the adequacy or inadequacy of any particular training program Denver may have adopted.